AO 91 (Rev. 11/11) Criminal Complaint

# UNITED STATES DISTRICT COURT
for the
Northern District of California

FILED
SEP -4 2019
SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTH DISTRICT OF CALIFORNIA

JCS

| United States of America | ) | |
|---|---|---|
| v. | ) | |
| Andre Nicolas Gay, | ) | Case No.  3 19 71460 |
| | ) | |
| Defendant(s) | ) | UNDER SEAL |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of __September 11, 2017__ in the county of __San Francisco__ in the __Northern__ District of __California__, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 42 U.S.C. § 1320a-7b(b) | Criminal penalties for acts involving Federal health care "Anti-Kickback Statute." |

This criminal complaint is based on these facts:

Please see attached affidavit.

☑ Continued on the attached sheet.

Approved as to form:

_/s/_
WILLIAM FRENTZEN
Assistant United States Attorney

_Complainant's signature_

Janette Spring, Special Agent - FBI
_Printed name and title_

Sworn to before me and signed in my presence.

Date: 9/4/19

_Judge's signature_

City and state: San Francisco, California     Hon. Joseph C. Spero, U.S. Chief Magistrate Judge
_Printed name and title_

# AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, Janette Spring, Special Agent with the Federal Bureau of Investigation ("FBI") being first duly sworn, hereby depose and state as follows:

## I. INTRODUCTION

### A. SYNOPSIS

1. I submit this affidavit in support of a criminal Complaint for Nicholas Andre GAY ("GAY").

2. There is probable cause to believe GAY engaged in a scheme to commit Medicare fraud by receiving cash kickback payments in exchange for the referral of home healthcare patients in violation of 42 U.S.C. §1320a-7b(b), the anti-kickback statute.

3. As part of this investigation, the Agents have obtained information from the cooperation of an FBI confidential witness ("CW-1")[1] and evidence obtained by an FBI undercover employee ("UCE"):

4. An identified co-conspirator introduced GAY to CW-1 and UCE as an individual who was willing to accept kickback payments in exchange for the referral of patients.

5. During the course of the investigation, UCE held multiple in-person audio and video recorded conversations with GAY in 2017 and 2018, in which GAY received a kickback payment in the form of cash in exchange for the referral of patients for home health services.

---

[1] CW-1 has provided information and services to the FBI over approximately two years and has received no monetary compensation or other consideration from the FBI in exchange for the information and services. However, CW-1 was employed by a home health care agency ("HHA Alpha"), which served as a cooperating entity supporting the FBI's undercover operation. As a result of the undercover operation, patient numbers and/or revenue to CW-1 and CW-1's HHA may have increased. These potential increases to CW-1's HHA may have provided benefit to CW-1 by improving his/her standing with the employing HHA. A criminal background check of CW-1 revealed convictions for embezzlement, grand theft, and an arrest for false claim to citizenship. CW-1 is an undocumented immigrant who entered the United States illegally and by presenting false identifying documents to a CBP officer. The CW-1 later falsely denied having possessed false identifying documents when interviewed by immigration officers. Although CW-1 is a removable alien, removal has been deferred under the Convention Against Torture. The CW-1 may have an incentive to curry favor with federal law enforcement because of his immigration status. After the conclusion of this undercover operation, FBI Agents became aware that during the undercover operation but after HHA Alpha was no longer accepting patient referrals from targets of the investigation, CW-1 was believed to have tried to use his/her role as a source to threaten an individual – with whom he/she had a personal dispute – with a law enforcement investigation into the practices of this individual. To my knowledge, those threats were never carried out. CW-1 is not currently the subject of any pending criminal charges.

1

## B. BACKGROUND OF LEGAL FRAMEWORK AND INVESTIGATION

6. Starting in the 1970s, Congress created, amended, and strengthened the "Anti-Kickback Act", currently United State Code, Title 42, Section 1320a-7b(b). The relevant language of the statute is listed below. In essence, the law criminalizes influencing referrals for federally funded health care through payments. The legislative history revealed Congress was deeply concerned the normalization of kickbacks in federally funded health care programs would lead to fraud and an undermining of the quality of patient services since "operators become more concerned with rebates than with care. [2]" FBI Agents began looking into kickbacks in the San Francisco Bay Area, specifically in the fields of home health and hospice. Their investigation arose from concerns of false billing, referrals without patient care in mind, that health care providers would have a willingness to expose their patients to unnecessary treatments and that certain home health agencies ("HHAs") would have a willingness to bill for, but not provide, necessary services. The preliminary investigation into kickbacks occurring in the Bay Area in the fields of home health and hospice revealed that the above concerns were indeed occurring. Some of the most egregious examples uncovered by the investigation included doctors who referred patients to hospice care in exchange for kickbacks while demanding a "longevity" bonus – meaning the doctor would financially benefit the longer a patient remained on hospice. Since hospice is generally meant for palliative care without curative intent, this system could encourage doctors to abandon curative options earlier with potentially life threatening outcomes.[3]

7. An undercover operation was selected as the means of investigating kickbacks. From training and experience, the investigators understood that health care providers and HHAs shrouded their activities in secrecy. Typically, health care providers were given kickbacks in the form of cash payments made in closed door meetings between themselves and HHA representatives. Some used bogus medical directorship/consultant contracts to disguise kickbacks as payments for seemingly legitimate, but actually

---

[2] "Kickbacks Among Medicaid Providers", Senate Report 95-320, 1977.

[3] In fact, throughout the course of the investigation, four of the targets, while negotiating kickback payment amounts, discussed similar "longevity" bonuses. UCE agreed to these bonuses or entertained further discussion to potentially identify any such referrals by proactively identifying at-risk patients. During the course of the investigation, no such longevity bonus referrals were made to the UCO.

2

non-existent, services. Given the expected closed nature of the transactions and the relatively traceless nature of cash payments, traditional documentary and other overt investigative techniques were deemed to be ineffective. An undercover operation ("UCO") was considered as the most efficient and most successful means to gather direct evidence of the payments and the corrupt intent of the kickback payments

8. Around July 2016, two employees of a known Bay Area home health agency ("HHA Alpha") made a complaint to Health and Human Services Office of Inspector General ("HHS-OIG") regarding payments of kickbacks to doctors by other HHAs in the Bay Area. One of the two agreed to serve as a cooperating witness ("CW-1"). CW-1 was paired with an undercover FBI agent ("UCE"), based in San Francisco, who would portray himself/herself as someone representing investors, intent on acquiring HHA Alpha and seeking to expand HHA Alpha's patient population through illegal kickbacks. UCE often communicated with targets in furtherance of the UCO while in San Francisco. The UCO sought to investigate predicated targets and to use predicated targets to refer UCE to other violators who the targets believed to be engaged in similar conduct.

9. In designing the UCO, investigators learned health care providers were weary of potential legal risks that caused them to be unwilling to accept kickbacks from an unknown undercover agent without an introduction from a known member of the industry. Further, the nature and size of the kickbacks were dependent on the types of HHA services required. For example, certain types of insurance and services were reimbursed at a higher rate, which in turn would lead to higher kickbacks. Many health care providers were also quite concerned with patient satisfaction, partially to avoid a disgruntled patient from questioning the corrupt HHA referral. Therefore, the ability to provide specific details about services, accepted insurance plans, and patient satisfaction was critical to both gaining the initial introductions and to allowing the UCO to expand. The involvement of a vetted HHA would facilitate entry of the UCO and allow kickback referrals to be diverted away from predicated HHA companies. Further, the care provided by the vetted HHA could be monitored and reviewed.

10. In keeping with those goals, HHA Alpha effectively served as a cooperating entity through its management and its participation in the UCO. The FBI investigation was partly based upon

3

analysis of so-called outlier data – data showing abnormal and potentially illegal conduct – among HHAs and doctors as well as through interviews. Based on examination of the data and interviews, HHA Alpha did not fall into the profile of a likely kickback offender. Checks of FBI databases did not reveal HHA Alpha as a prior or current subject of any investigations. Additionally, the FBI consulted with HHS-OIG and determined HHA Alpha was not a prior or current subject of any investigations. From the founding of HHA Alpha in 2009 until the initiation of the UCO, Medicare received two complaints[4], which were later deemed to be unsubstantiated. Additionally, HHA Alpha's owner was aware that CW-1 would be cooperating with an investigation and the patient paperwork and referrals to HHA Alpha during the UCO were required to be brought to the attention of the investigating agency. Patients referred to HHA Alpha by physicians and others receiving payment from FBI through the UCO, (1) were contacted by an employee of HHA Alpha to obtain their consent for treatment by HHA Alpha, (2) as a result of this consent and intake process, some patients ultimately did not receive treatment from HHA Alpha because they declined treatment, preferred an HHA of their own choosing, or medical evaluation determined treatment was inappropriate, (3) HHA Alpha was made aware of patients that were referred through the course of the UCO, and (4) FBI conducted interviews of all available patients referred to HHA Alpha and there were no serious allegations of failure in patient care. [5] During the course of the UCO, there was one complaint regarding patient care provided by HHA Alpha made by a recently hired, and then fired employee, but an investigation by the California Department of Public Health did not result in any negative finding against HHA Alpha. No other complaints about HHA Alpha were reported to Medicare through the duration of the UCO. During the course of the UCO, a total of 27 subjects were paid kickbacks and referred patients to HHA Alpha. At no time during their meetings with CW-1 and/or UCE

---

[4] An anonymous complaint filed in 2016 alleged a durable medical equipment kickback scheme, which was closed due to insufficient information. In 2015, Medicare closed a patient allegation of false billing by HHA Alpha after a review of documents provided by HHA Alpha justified the billing.

[5] Only three patients out of 129 interviewed by FBI complained and the complaints consisted of (1) early discontinuation of treatment, (2) a nurse should have shown up more often, and (3) physical therapy should have been longer. Of all patients referred to HHA Alpha by targets of the investigation during the UCO, the FBI was unable to interview 31 patients due to the patients passing away in hospice care or because the patients could not be located – generally international patients. As to those patients, no complaints regarding patient care were ever filed against HHA Alpha.

4

did the subjects express any concerns regarding the treatment of their patients by HHA Alpha nor notify that any patient complaints had been received. Further, none of the subjects indicated they were aware of any illicit conduct by HHA Alpha prior to or during the UCO.

### C. AGENT QUALIFICATIONS

11. I am a Special Agent of the FBI and have been so employed for approximately three years. I am currently assigned to the Complex Financial Crime Squad of FBI's San Francisco Field Division. As part of my assigned duties, I investigate possible violations of federal criminal law, specifically investigations involving white collar crime. I have received specialized training in health care fraud matters including, but not limited to, Anti-Kickback, Mail Fraud, Wire Fraud, and False Claims. I have participated in the execution of various arrests and search warrants in which business and personal documents, bank records, computers, and other evidence of fraud and other crimes have been seized.

12. In the course of this investigation and my investigation of other health care fraud schemes, I have (1) interviewed numerous persons; (2) reviewed numerous records and pertinent data; (3) read interviews and other reports written by other law enforcement officers; and (4) become familiar with the manner and means by which health care fraud schemes are operated including violations of 42 U.S.C. Section 1320a-7b and 18 U.S.C. Section 371.

13. This affidavit is intended to show merely that there is sufficient probable cause for the requested Complaint and arrest warrant and does not set forth all of my knowledge about this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only. Where excerpts of transcripts of audio recorded conversations are presented, they represent my best effort at this time to transcribe such recordings and I believe them to be accurate in substance.

### D. COMPLAINANT

14. Nicholas Andre GAY, is a 39-year-old licensed physician who resides in Union City, CA and is employed at the Fremont Orthopedic & Rehabilitative Medicine located at 39180 Farwell Drive, Suite 110, Fremont, CA. During the course of the investigation, GAY accepted kickbacks from an FBI UCE in exchange for patient referrals.

5

E. STATUTES VIOLATED

15. **Title 42, United States Code, Section 1320a-7b(b)(1)(A)**, in relevant part, makes it a crime for any person to knowingly and willfully solicit or receive any remuneration (including any kickback, bribe, or rebate) directory or indirectly, overtly or covertly, in cash or in kind to any person to induce such person to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program.

II. PROBABLE CAUSE

A. GAY IS INTRODUCED TO UCE BY A CO-CONSPIRATOR

16. In January 2017, CW-1 identified Glennda SANTOS ("SANTOS") as a prominent marketer employed by several HHAs in the area.

17. CW-1 informed agents that SANTOS was participating in a cash-for-patient referral scheme involving physicians, hospital case managers, and employees at skilled nursing facilities throughout the San Francisco Bay Area. In so doing, SANTOS would give envelopes of cash to these individuals in order to direct patient referrals to the HHAs.

18. During the course of the UCO, SANTOS introduced multiple individuals willing to accept kickback payments in exchange for home health or hospice patients. GAY was later introduced to CW-1 and UCE by SANTOS.

19. On or about August 31, 2017, SANTOS introduced CW-1 and UCE to GAY and his business partner. During their meeting, GAY provided UCE with his telephone number and advised he would be willing to meet with UCE to discuss a partnership.

20. Following their meeting, UCE asked SANTOS whether or not GAY could be trusted to participate in the kickback scheme. In response, SANTOS reassured UCE that GAY could be trusted and indicated GAY was already familiar with kickback schemes. Set forth is an excerpt of the aforementioned exchange:

| Speaker | Statement | Additional Explanation |
|---|---|---|
| UCE: | We didn't want to say anything because we didn't know about his partner. | UCE comments that he/she was unaware of whether it was safe to discuss the kickback scheme with GAY and/or GAY's business partner. |
| SANTOS: | Yeah, yeah, yeah. But he's ok. I go to bed with him, so he's ok, he knows already the deal. | SANTOS responds that GAY is already familiar with the kickback scheme (i.e. "he knows already") and implies GAY already engages in such illegal conduct. |

21. On or about September 1, 2017, UCE sent a group text to GAY and CW-1 thanking GAY for offering to meet. Set forth below is an excerpt of the aforementioned exchange:

| Speaker | Statement | Additional Explanation |
|---|---|---|
| UCE: | Great meeting you. Looking forward to explaining our company to you soon. [UCE and CW-1] | |
| GAY: | Thanks fellas. Look forward to it | |

### B. GAY ACCEPTS KICKBACKS IN EXCHANGE FOR THE REFERRAL OF PATIENTS

22. On or about September 11, 2017, UCE recorded a meeting with GAY at his medical office in Fremont, CA. During their meeting, UCE explained the plan to takeover HHA Alpha and increase the patient population at the company. UCE explained this would be accomplished by establishing trusted relationships with physicians. Below is an excerpt of the aforementioned exchange:

| Speaker | Statement | Additional Explanation |
|---|---|---|
| UCE: | Yes. Anyway. So in a year, [CW-1] will be taking over operations um, and we're, as I'm sure uh, Glennda has told you, we're tryin' to use a little bit more aggressive techniques to increase our census, we're about three hundred… | UCE explains, per the agreement with SANTOS, UCE was seeking to establish relationships with physicians willing to accept cash for patient referrals, or use "aggressive techniques". |
| GAY: | Yeah. | |
| UCE: | …and we'd like to double it to about six hundred. | |
| GAY: | Okay. | |
| UCE: | So that, of course means uh, making some trusted relationships with doctors um,… | UCE further explains the arrangement is only with those that can be trusted to engage in the scheme. |
| GAY: | Mmhmm. | |
| UCE: | …and so that's the main reason we're here. So. | |
| GAY: | Great. | |
| UCE: | Does that sound in line with what you were expecting? I hope. | |
| GAY: | Yes, yes. | |

7

23. During the same meeting, GAY stressed the need to document his time as a way to legitimize their arrangement. Below is an excerpt of the aforementioned exchange:

| Speaker | Statement | Additional Explanation |
|---|---|---|
| GAY: | So with me it's all about um, you know, documenting my time spent… | |
| UCE: | Mmhmm. | |
| GAY: | …and everything being on the up and up, you know, if we ever get asked about our relationship but it's… | GAY wants their arrangement to appear legitimate or "on the up and up". |
| UCE: | Understood. | |
| GAY: | …it's not for referrals it's for time spent, help with protocols and all that stuff. Uh, I'm happy to be accessible to anyone at any of your facilities. | GAY further stresses their arrangement should not reflect payment for patients. GAY offers to his availability for consultation as a way to legitimize the payments. |

24. UCE offered to create an entity for which UCE and GAY could engage in a consulting agreement, identifying services allegedly provided by GAY. Below is an excerpt of the aforementioned exchange:

| Speaker | Statement | Additional |
|---|---|---|
| UCE: | We can create another entity if that's what, what, but if, if you're comfortable in the meantime with a more informal relationship, of course ev, everything thing we, you know, as far as everyone knows this is all about consulting, so. | |
| GAY: | Good. | |
| UCE: | Understood. | |

25. In continuation of their discussion regarding the consulting agreement, GAY explained he held similar arrangements with skilled nursing facilities and other home health companies. GAY admitted he received $5,000 from other HHAs and agreed to receive $3,000 per month from UCE. GAY agreed to slowly increase the number of patients he referred to HHA Alpha each month in exchange for a higher kickback payment. Based on the terms of their agreement, GAY accepted $3,000 cash from UCE in exchange for patient referrals to HHA Alpha. Below are excerpts of the aforementioned exchange:

| Speaker | Statement | Additional Explanation |
|---|---|---|
| GAY: | …so um, um, the skilled nursing per location is at three thousand a month. | GAY explains that his current agreements with one or more skilled nursing facilities involves monthly payments of $3,000. |
| UCE: | Mhm. | |
| GAY: | The home health I was at previously was five thousand per month. | GAY explains that he previous earned $5,000 per month working with a different HHA. |
| UCE: | Okay. | |

8

| Speaker | Statement | Additional Explanation |
|---|---|---|
| GAY: | And that was really the maximum that I could really document justify I spent the time to, to justify. | GAY implies that it is difficult to legitimize larger payments. During this meeting, GAY provided UCE with a sample invoice that could be used as a cover document in their kickback scheme. |
| UCE: | Okay. | |
| ... | | |
| UCE: | Understood. | |
| GAY: | Um, so you have to let me know how that fits in with your models. | GAY asks UCE to respond to the various payment options. |
| ... | | |
| UCE: | So uh, if, ya know, I'll, I'll, I'll bring up what, what, what, what we um, what we, somewhat we think that one of the better things to do is to not have a relationship with a doctor um, become too fast too quick. We think that that, that looks bad. Um, so we were um, we, generally what we do is we ask for a couple in the beginning, next month we double it, next month we double it, and just slowly graduate up, looks like you tried us, you liked our services, we're (UI) feedback and everything like that. | UCE explains to GAY how they will increase GAY's patient referral numbers over time to make it appear less suspicious (i.e. not "look bad") and make it less likely that authorities will discover the kickback scheme. |
| GAY: | Yeah. | |
| UCE: | So that's sort of what we were looking at but I'm happy to start out today just to establish our relationship. Is three okay to start for today? | UCE offers GAY a payment of $3,000 to begin their relationship and the kickback scheme. |
| GAY: | Yeah. That's okay. | GAY accepts UCE's payment and thereby indicates his willingness to participate in the kickback scheme. |

26. GAY offered to document his time with UCE in order to legitimize the arrangement. UCE explained the owner of HHA Alpha would remain unaware of UCE's arrangement with GAY. UCE was not an actual employee of HHA Alpha and was not authorized to make consulting arrangements on behalf of the company. UCE explained GAY would not in actuality provide any services in exchange for the contract as GAY would never be contacted by HHA Alpha's owner. Below is an excerpt of the aforementioned exchange:

| Speaker | Statement | Additional Explanation |
|---|---|---|
| GAY: | And I'll work towards documenting everything and deal with you guys maybe you know maybe another dinner meeting and… | GAY offers to schedule meetings with UCE in order to legitimize UCE's payments. |
| UCE: | Sure. Sure. | |
| GAY: | …and hash out all the responsibilities and stuff. | |
| UCE: | Sure. Um, un, understood. Um, you know, just, just understand that in the position we're in, anything that formal, that requires [HHA Alpha owner]'s involvement, [HHA Alpha owner] is not, I don't think she's stupid as to what we're doing but eh, she's not | UCE explains that while it is likely HHA Alpha's owner is aware UCE and CW-1 are paying kickbacks for patient referrals, the owner does not approve or "sign off" on any of the |

9

| | | |
|---|---|---|
| | signing off on what we're doing, so we just have to be careful on um, let's say on too formalized in relationship, but basically,… | payments and would not agree to consulting work with GAY. |
| GAY: | Yeah. | |
| UCE: | …you know, if, you know, if she finds out that someone else is a medical consultant she'll be like I didn't hire anyone else as a medical consultant. | UCE explains HHA Alpha's owner already has legitimate medical consultants and was unlikely to approve the hiring of any additional consultants. |
| GAY: | Yeah. | |
| UCE: | So, for a little while, but I'm happy to meet with you and have dinners and talk about progress and other things like that, that's absolutely fine. | |
| GAY: | Yeah. | |
| UCE: | Um, and uh, you know, I think you understand the kinds of patients that we're looking for. | |
| GAY: | Yeah. | |
| UCE: | Um, obviously Medicare pays the best but, you know, we understand that needs to be spread out over uh, over different things, and we wouldn't accept exclusivity on anything um, and the, and the other thing that uh, we wanna say is we are very much uh, not a pressure group. I, I know some of our competitors are a little bit more demanding. We think exclusivity looks bad. Uh, we expect people to work with many other people, and if at any point you change your mind for any reason, we are, we are a hand shake, we are, we are, thank you very much for your time, no issues whatsoever. If you're not happy with the care we're providing or the direction it's going, where you have any doubt at any moment that you just say this isn't for me, for whatever reason, no problem, just, just tell us the word and we'll shake your hand and we'll say thanks and we'll, we'll, we'll let it be. | UCE explains their preference for Medicare patients but acknowledges the importance of accepting patients from a variety of insurances to avoid red flags with Medicare. |
| GAY: | Yeah. | |
| UCE: | Does that sound fair? | |
| GAY: | Cool yeah. I, I uh, like uh, people who are flexible with the eco system and these things do grow with time. | |

27. Toward the end of their meeting, UCE paid GAY $3,000 cash in anticipation of beginning their arrangement. GAY and UCE then discussed drafting a consulting contract with a company created by UCE and independent of HHA Alpha. GAY gave UCE a copy of a medical director contract GAY held with a nearby rehabilitation facility ("Facility #1"[6]). GAY explained Facility #1 was recently reviewed by the Department of Justice ("DOJ"). Following the DOJ's review, Facility #1 was required to include language in their consulting contracts, explaining the consultant's compensation was

---

[6] Names of entities not charged in this investigation have been redacted throughout this affidavit.

not in exchange for patient referrals. UCE re-iterated that GAY would not provide any actual services to HHA Alpha as their agreement was not with HHA Alpha, but rather with UCE's company, and the owner of HHA Alpha would be unaware of the agreement's existence. Below is an excerpt of the aforementioned exchange:

| Speaker | Statement | Additional Explanation |
|---|---|---|
| UCE: | Um, so, so here's uh, so these are each uh, one thousand dollars. Um, we can create something, the only problem is that if it's going to be a contract directly with [HHA Alpha] it's going to be a problem. Um, we can create um, like an L.L.C. called [HHA Alpha] Consulting. | UCE pays GAY $3,000 cash split up into three envelopes containing $1,000 each. |
| GAY: | Good. | |
| UCE: | If that works for you. | |
| GAY: | Yeah. | |
| UCE: | And then we um, if you would like to, if you'd like to have any terms of it laid out in there um, if you have examples that'd be great. | UCE asks GAY for examples of contracts from which they can create their own agreement. |
| GAY: | Yeah, exactly and this would be quick and easy. I know that, the skilled nursing that I contract for, [Facility #1] | |
| UCE: | Mmhmm. | |
| GAY: | It was only [co-conspirator #1[7]] and Glennda's [SANTOS]. But it says they were uh, evaluated by the DOJ. | |
| UCE: | Oh, okay. | |
| GAY: | For any potential violations, and so they added language into their consulting contracts to make it clear, that it's not…ya know. I'll, I'll copy this for us. | GAY explains the contracts included language which addressed the improper referral relationship between consultants and the facility. |
| UCE: | Okay. | |
| GAY: | You take it with you. So it's just clear that we're working together, but this isn't a direct, you know, pay for referrals type thing. | GAY reiterates the importance of having a document which states payments from UCE are not in exchange for patient referrals. |
| UCE: | Understood, understood. | |
| GAY: | That's where we gotta… | |
| UCE: | Okay. | |
| GAY: | 'Cause language in there helps | |
| UCE: | And, and so that, that withstood their scrutiny? | |
| GAY: | Well, they added it, I mean they were, they were found not guilty of anything. | |
| UCE: | Excellent. | |
| GAY: | in their evaluation, but they still as a provision added some language in here. | |

---

[7] Names of individuals not charged in this investigation have been redacted throughout this affidavit.

11

| UCE: | So just to, just to make sure, are you comfortable with eh, if we create a company that's similar in name, like [HHA Alpha] Consulting? | UCE offers to create an entity separate from HHA Alpha for which UCE and GAY can create a consulting agreement. |
|---|---|---|
| GAY: | Yeah. | |
| UCE: | That we do an agreement there, understanding that, that [HHA Alpha owner]. um, eh, we,... | |
| GAY: | Yeah. | |
| UCE: | ...we can't explain it to [HHA Alpha owner] so, so just understand that it will be sort of a contract of this company that we create just for this purpose. | UCE again explains any contract they create will not pertain to the actual company, HHA Alpha. |
| GAY: | Got it. | |
| UCE: | And [HHA Alpha owner]. probably won't ever call you because he won't, she won't know to call you (laughs). | UCE re-iterates GAY would not be expected to provide any actual services to HHA Alpha. |
| GAY: | Oh, that's okay. | |
| UCE: | That's fine. That's understood. I'm happy to have paperwork that explains anything. | |
| GAY: | Okay. | |

28. Based on their conversation, UCE understood GAY wanted a similar cover for their anticipated kickback scheme. In creating the contract, GAY could disguise the kickback payments as legitimate services provided to HHA Alpha.

29. Between mid-November 2017 and September 13, 2018, UCE sent numerous text messages to GAY in connection with their on-going discussion regarding the contract.

30. During a second recorded meeting on November 9, 2017, GAY and UCE spoke in greater detail about a medical director or consulting contract and the need to generate invoices in order to conceal the kickback payments as legitimate services provided to HHA Alpha. Below is an excerpt of the aforementioned exchange:

| Speaker | Statement | Additional Explanation |
|---|---|---|
| UCE: | And, any changes that your counsel wants, is fine. And then we can, uh, uh, agree upon a rate in here, five hundred sounds fine. | |
| GAY: | Mmhmm. | |
| UCE: | And we'll- you'll- you'll just invoice us as we need. | UCE is asking GAY for an invoice reflecting the kickback amount paid to him each month. |
| GAY: | Yeah. | |
| UCE: | And ramp up however slowly you want. | UCE tells GAY to slowly increase the number of patients GAY refers to HHA Alpha. |
| GAY: | Yeah. Cool. | |
| UCE: | Sound good? | |
| GAY: | Yeah, man. | |

31. On or about September 13, 2018, UCE recorded a meeting with GAY at a restaurant in Fremont, CA. During their meeting, UCE advised GAY the previously discussed cover contract was being drawn up. Toward the end of their conversation, GAY confronted UCE about whether or not UCE was law enforcement. After UCE reassured GAY that s/he was not law enforcement, GAY gave examples of other physicians who engaged in similar kickback schemes and how brazen their arrangements were. Below is an excerpt of the aforementioned exchange:

| Speaker | Statement | Additional Explanation |
| --- | --- | --- |
| GAY: | I mean that works for me as long as yeah it's um legal and you know. | |
| UCE: | Well so the issue, so the-the consulting is-is um, I mean that's a, that's a contract but is designed entirely to make it any payment not be related to any patients that are being sent. | UCE explains how the contract is not legitimate and, instead, it is designed to conceal the kickbacks, i.e. the payments from HHA Alpha for patient referrals. |
| GAY: | Right. | After UCE's explanation, GAY confirms his understanding and agreement. |
| UCE: | 'Cause the patients, the patients that we're paying for are going to another company and this makes it look you're consulting for us and since the meetings are verbal it's just you and I. We sat down at Counter Burger we talked for four hours. You gave me advice there's no, there's nothing you produced, there's no there's nothing, there's nothing that anyone can say (UI) well show me what happened. You just gave me advice I told you, hey, we're thinking about this company you gave me advice on. | UCE describes how a consulting contract disguises the act of paying kickbacks for patient referrals. And, in particular, how no work product is required to support the contract because they will falsely claim the consulting services were provided verbally (i.e. "there nothing anyone can say" or ask him to "show"). |
| GAY: | Yeah. | GAY agrees. |
| UCE: | um and so it's (entirely to) cover our butts. | UCE reiterates the sole purpose of the contract is to conceal their illegal conduct and kickback scheme (i.e. "cover our butts"). |
| GAY: | Gotcha. | |
| UCE: | Um and there's no connection between the patients that are being sent here. | |
| GAY: | Uh huh. | |
| UCE: | As far as anyone knows and what we're paying you. | |
| GAY: | Gotcha. | |
| UCE: | So does that sound- | |
| GAY: | It sounds reasonable ummm now do you work for the Department of Justice at all or FBI or anything like that? | GAY confronts UCE about whether he/she is connected to law enforcement. GAY's question shows that he is aware the discussed kickback scheme, his acceptance of $3,000, and the proposed fraudulent cover contract, are illegal. |

13

| | | |
|---|---|---|
| UCE: | No. | |
| GAY: | Work for them? | |
| UCE: | No. | |
| GAY: | Law enforcement of any kind? | GAY continues to push the above-discussed line of inquiry. |
| UCE: | (UI) I'm not. | |
| GAY: | Okay. | |
| UCE: | (Laughs) | |
| GAY: | I just, the stuff I hear is just silly (UI) I hear docs are taking like up to ten thousand dollars a month and some companies and- | GAY describes how he views the amount of payments in other kickback schemes as too brazen (i.e. $10,000 per month). |
| UCE: | So on top of that I and-and I'm-I'm not trying to cast uh d-dispersions about our competition but there are people that are demanding exclusivity. Like I want all of your stuff, which is, you might as well like raise a red flag and start burning it. | UCE responds to GAY's comment by saying UCE does not expect exclusivity with participants in the HHA Alpha kickback scheme. UCE agrees with GAY that an exclusive arrangement is tantamount to "rais[ing] a red flag" and "burning it" to attract law enforcement's attention. |
| GAY: | Yeah. | GAY expresses his agreement with UCE. |
| UCE: | Um we-we-we won't do that. | |

### C. GAY ENGAGES IN KICKBACK SCHEMES WITH OTHER HOME HEALTH AGENCIES
#### a. EWELINA SCENDZINA

32. During the course of the UCO, UCE held several audio/video recorded meetings with a home health marketer, EWELINA SCENDZINA ("SCENDZINA"). During their meetings, SCENDZINA accepted kickbacks from UCE in exchange for her agreement to send patient referrals to HHA Alpha. UCE and SCENDZINA also discussed physicians whom SCENDZINA believed to be engaged in similar kickback schemes.

33. During a meeting on July 30, 2018, SCENDZINA advised UCE she had recently met with GAY. SCENDZINA warned UCE about GAY as GAY was known to talk about his kickback arrangements with others. SCENDZINA gave an example when GAY told her about another physician [Doctor 1[8]] who engaged in similar kickback schemes. SCENDZINA thought GAY should keep the information to himself as those who engage in the schemes could lose their licenses. Below is an excerpt of the aforementioned exchange:

---

[8] Names of physician not charged in this investigation have been redacted throughout this affidavit.

14

| Speaker | Statement | Additional Explanation |
|---|---|---|
| SCENDZINA: | Yeah so and that's a problem, eh the problem is he's [GAY] a good guy but he talks. | |
| UCE: | Mmhmm. | |
| SCENDZINA: | And I have a feeling he might say to the wrong people. | SCENDZINA is worried GAY will talk about illegal kickback schemes with someone who could report the conduct to law enforcement. |
| ... | | |
| UCE: | Uh cause-cause we heard that he went with [Doctor 1] and we're like he you know we he was off limits | UCE explains since GAY started working with Doctor 1, GAY would only send patient referrals to agencies approved by Doctor 1. |
| SCENDZINA: | Because see this how he, he will sit with [Doctor 1] and tell you that he'll do this and then [Doctor 1] can (get you in trouble). Then when he sits with you he will tell you what [Doctor 1] is doing and that's what I don't like. | SCENDZINA explains how GAY talks negatively about physicians who engage in kickback schemes but then GAY engages in similar schemes himself. |
| UCE: | Yeah. | |
| SCENDZINA: | If you do this, keep it to yourself | SCENDZINA thought GAY should not openly discuss his, or any other physicians, engagement in similar kickback schemes. |
| UCE: | Yeah. | |
| SCENDZINA: | - you know what I mean because this second job that you can lose your license you need to be smart. You do this kind of stuff you can be triple agent. You can be KGB (UI) I don't care right but fucking keep it to yourself I don't need you spreading around like... | SCENDZINA refers to GAY as a "triple agent" as GAY engages in kickback schemes with several entities. |

34. SCENDZINA admitted she received patient referrals from GAY as GAY was on the payroll with her home health agency, among others companies, including Amity Home Health Care, Inc. ("AMITY"). Below is an excerpt of the aforementioned exchange:

| Speaker | Statement | Additional Explanation |
|---|---|---|
| SCENDZINA: | He's a he's on a Amity payroll but he's also double agent for [Doctor 2]. I think he, he... | SCENDZINA explains GAY is paid by AMITY for patient referrals. |
| ... | | |
| SCENDZINA: | And he's little (UI) so I uh I like go there and get my patients because he's on our payroll but this is it, he also get into gossip I go look I don't have time for that. | SCENDZINA explains her home health company pays GAY for patient referrals. |

### b. AMITY HOME HEALTH CARE, INC.

35. Digital evidence obtained from the cellphone of AMITY's owner, RIDHIMA "AMANDA" SINGH ("SINGH"), revealed GAY was likely engaged in a kickback scheme with AMITY

15

and received his kickback payments from SANTOS.

36. On or about August 10, 2018, SINGH and an AMITY marketer, BRENDA ADDISON ("ADDISON"), exchanged several instant messages via the message application "WhatsApp", in which they discuss paying GAY for patient referrals. SINGH and ADDISON further discuss their frustration with the type of patients GAY referred to AMITY in exchange for the payments. Below is an excerpt of the aforementioned exchange:

| Speaker | Statement | Additional Explanation |
|---|---|---|
| ADDISON: | she gave me 1500<br>[AMITY Marketer 1] 2500<br>she does have some left over she says she needs to give gay | SANTOS is asking to pay GAY. |
| SINGH: | Why | |
| SINGH: | No | |
| SINGH: | Call me | |
| SINGH: | Hurts these people can't abuse our money | |
| SINGH: | [AMITY Marketer 2]<br>Said all<br>Hmo | |
| SINGH: | Why would glennda wanna give him<br>Money | |
| SINGH: | Knowing he don't give Medicare's and when we did in past too he barely had | SINGH is justifying why she does not want to pay GAY as GAY does not refer many Medicare patients. |
| SINGH: | We can use that money elsehweee | |
| SINGH: | Rifht [Right] | |
| ADDISON: | that's why i have to tell you what's it for i agree we have to talk. to him and settle things out out and all he has is hmos then no we should not give him a dime | ADDISON explains they should not pay GAY unless he refers more Medicare patients. |
| SINGH: | Yes | |

D. **GAY ADMITS TO RECEIVING KICKBACK PAYMENTS IN EXCHANGE FOR PATIENT REFERRALS**

37. On January 18, 2019, GAY was interviewed by FBI Agents and advised them he accepted cash from a marketer [UCE] in the city to refer patients to that marketer's home health agency [HHA Alpa]. Additionally, GAY admitted he previously had a consulting agreement with AMITY which initially began as a legitimate contract where he designed medical policies and protocols; however, toward the end of his contract with AMITY, they were just paying him for patient referrals to AMITY.

FBI Agents asked GAY, "so it was like a straight up, like hey, we're gonna give you money for like, patient type deal?" to which GAY answered, "Yeah".

### III. PROBABLE CAUSE FOR THE VIOLATION

#### A. TITLE 42 UNITED STATES CODE, SECTION 1320A-7B(B)(1)(A), THE ANTI-KICK BACK STATUTE

38. Title 42 United States Code, Section 1320a-7b(b)(1)(A), in relevant part, makes it a crime to knowingly and willfully solicit or receive any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person to refer an individual to a person for the furnishing or arranging for the furnishing of any service for which payment may be made in whole or in part under a Federal health care program.

39. Based on all of the foregoing, probable cause exists to believe that GAY accepted kickback payments from UCE that were intended to induce GAY to send patient referrals to HHA Alpha for home health and/or hospice services later billed to Medicare.

40. Medicare is a federally funded health care program, and the referral of patients to HHA Alpha by GAY for home health or hospice services constitutes a referral, as defined by Title 42 United States Code, Section 1320a-7b(b)(1)(A).

41. Therefore, there is probable cause to believe GAY's agreement to send patient referrals to HHA Alpha in exchange for cash payments from UCE meets the definition of a kickback payment and violates anti-kickback statute.

### IV. CONCLUSION

42. Based on the foregoing, there is probable cause to believe GAY conspired to receive a kickback payment in exchange for patient referrals, in violation of 42 U.S.C. § 1320a-7b(b)(1)(A), the anti-kickback statute.

### V. REQUEST FOR SEALING

43. Since this investigation is ongoing, disclosure of the Complaint, this affidavit, and/or this application and the attachments thereto will jeopardize the progress of the investigation. Disclosure could result in the destruction of evidence, intimidation or collusion of witnesses, or the flight of a suspect.

Accordingly, I respectfully request the Court issue an order directing this Affidavit and any related documents be sealed until the further order of this Court.

_____
Janette Spring, Special Agent
Federal Bureau of Investigation

Sworn to and subscribed before me this ___ day of September, 2019.

_____
HON. JOSEPH C. SPERO
United States Chief Magistrate Judge

18